## OTTE *v.* UNITED STATES (No. 1614).[1]

1. A TRAWL IS EQUIPMENT FOR, NOT PART OF, A VESSEL.
    A trawl is not a *part of* the vessel which draws it, but is *equipment for* the vessel.
2. TRAWLS FOR REPAIRS NOT ADMISSIBLE FREE OF DUTY.
    Trawls imported for repairs are not admissible free of duty as original equipment of American vessels under subsection 5 of paragraph J of section 4, tariff act of 1913, or as repair parts of such vessels under subsection 6 of that paragraph.

United States Court of Customs Appeals, May 29, 1916.

APPEAL from Board of United States General Appraisers, Abstract 38222.

[Affirmed.]

*Comstock & Washburn* and *Carroll E. Pillsbury* (*Albert H. Washburn* and *J. Stuart Tompkins* of counsel) for appellant.
*Bert Hanson*, Assistant Attorney General (*Robert Hardison*, special attorney), for the United States.

[Oral argument Apr. 25, 1916, by Mr. Washburn and Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:
The appellant represents the owners of certain steam trawlers which appear to have been built at Quincy, Mass., and which are essentially of the same character. As the issue is finally presented

---

[1] Reported in T. D. 36489 (30 Treas. Dec., 1043).

in this court, the claim is made for trawl nets, so called, imported to be used as repairs upon these trawlers. The importer claimed the merchandise to be entitled to free entry under subsection 5 of paragraph J of section 4 of the act of 1913, and also subsection 6 of the same paragraph, which subsections read as follows:

J. Subsection 5. That all materials of foreign production which may be necessary for the construction of naval vessels or other vessels of the United States, vessels built in the United States for foreign account and ownership, or for the purpose of being employed in the foreign or domestic trade, and all such materials necessary for the building of their machinery, and all articles necessary for their outfit and equipment, may be imported in bond under such regulations as the Secretary of the Treasury may prescribe; and upon proof that such materials have been used for such purposes no duties shall be paid thereon.

J. Subsection 6. That all articles of foreign production needed for the repair of naval vessels of, or other vessels owned or used by, the United States and vessels now or hereafter registered under the laws of the United States may be withdrawn from bonded warehouses free of duty, under such regulations as the Secretary of the Treasury may prescribe.

Turning to the testimony for a description of these trawl nets, we quote from the testimony of Superintendent Harrison I. Cole as follows:

Q. What experience have you had in the handling and equipment of these steam trawlers?—A. Such as I have gained in the employ of this company.

Q. You have sailed in one of them yourself?—A. I have.

Q. Will you describe as best you can what is meant by a trawl?—A. Piece of apparatus resembling in a way a dredge or drag, made in the form of a bag out of manila twine and in combination with wooden boards. They are hung in such a way as to spread this trawl and kept together with wire and manila ropes and towed by the motive power of the vessel by steel wire ropes, and then the trawl is towed next to the bottom of the ocean.

Q. Have you seen them yourself attached to the trawlers owned by the Bay State Fishing Co.?—A. I have.

Q. I show you a plan of the steam trawl with the otter trawl net and ask you to state what it represents?—A. It represents a typical outline or plan of the so-called steam trawler, showing the towing vessel in its combination with the trawl itself, and the general arrangements of the attachments to the vessel, and the connection to the towing winch and deck. It shows the lead of the wires and in a conventional way the location of the trawl as it is being towed along the bottom of the ocean.

\*  \*  \*  \*  \*  \*  \*

Q. I show you this plan, Mr. Cole, and ask you to state as best you can just how the trawl is attached in a permanent way to the steam trawler?

Mr. Wood. I object to the use of the word permanent.

General Appraiser Hay. Answer how it is attached.

A. The first attachment, or the underboard attachment, is to a powerful steam winch, where the warps or towing wires are closed in order to chute or lower the net to draw it on the bottom or to draw in and discharge its contents. From this winch the towing warps lead one to a frame over their fair leaders. There are two wires, one to the forward gallows frame and another to the aft gallows frame, and these wires are attached to otter boards, and from one end of the respective otter boards forward or aft the trawl warp is attached by tackle and wire rope from one trawl to another by manila or wire ropes.

Q. Is the net always attached to the otter boards?—A. It is always attached to the otter board when in use, and in all cases even when stowed away, except when we exchange one part of the trawl for another.

On cross-examination the witness testified:

Q. Are you acquainted with the operation of removing these trawls?—A. I am.

Q. You have seen it done?—A. Yes, sir.

Q. How many men does it take?—A. It might be done by two or three, but usually it is done by six men.

Q. Is it a large, bulky object?—A. In the neighborhood of 500 pounds.

Q. How long would it take to remove it from the boat?—A. Of course, if the boat was lying alongside of the dock, it might perhaps be removed in 15 or 20 minutes. That is to say, the part of the trawl which consists of this manila twine; to remove the otter boards or the frame which I consider a part of the trawl would take two or three days, because it would be a matter of removing part of the structure of the vessel.

The importer also offered testimony tending to show that these vessels were peculiarly designed to haul a trawl, and in the opinion of the witness they could not be successfully used for any other commercial purpose.

The Board of General Appraisers held that under both subsection 5 and subsection 6 regulations had been adopted by the Secretary of the Treasury by virtue of express authority contained in the statute, and that the record upon which the case was submitted failed to bring the trawls in question within the purview of either subsection 5 or subsection 6 and the regulations contained in T. D. 34150.

The original brief contended for free entry and invoked both subsection 5 and subsection 6, but since the argument, in a supplemental memorandum, it is stated by counsel for the importer—

Appellant does not press any contention under subsection 5. He relies upon subsection 6.

The meritorious question in the case is whether these trawl nets are a part of the vessel within the meaning of the terms of subsection 6, or are to be treated as equipment of the vessel. The Treasury Department ruled that they were to be regarded as equipment, and that they were similar to fish nets used on ordinary fishing vessels. The importer contends that they are to be treated as a part of the vessel as distinguished from equipment.

That the Congress intended to distinguish between equipment and the vessel itself is apparent from a reading of the two subsections above quoted. The line of distinction between equipment and the vessel is somewhat difficult to mark.

This question was considered by the Board of Naval Construction, and their report in part reads as follows:

Equipment, used in a general sense, may be defined as any portable thing that is used for, or provided in, preparing a vessel whose hull is already finished for service. It is the furniture of whatsoever nature which is put into a finished ship in equipping her. The Queen's Regulations and Admiralty Instructions give the following defini-

tion: "Equipment, in relation to a ship, includes the furnishing a ship with any tackle, apparel, furniture, provisions, arms, munitions, or stores, or any other thing that is used in or about a ship for the purpose of fitting or adapting her for the sea or for naval service."

In estimating the displacement of a ship naval constructors use the term "hull and fittings" in contradistinction to "equipment," the fittings of the hull being understood to be any permanent thing attached to the hull which would remain on board were the vessel to be laid up for a long period.

Adopting these definitions, the board is of the opinion that the term "equipment" would not include donkey engines, pumps, windlasses, steam steerers, and other machinery but that it would include anchors, chain cables, boats, life-saving apparatus, nautical instruments, signal lights, and similar articles.

This construction was followed by the Customs Regulations of 1908 (art. 726), wherein the equipment of a vessel is defined as "that part which prepares her for a voyage, as rigging, sails, anchors, cables, chains, etc."

In the opinion of the Attorney General (27 Ops. Atty. Gen., 228) the question presented was whether a certain steam evaporator and steam pump which were used on a dredge and firmly and permanently attached to the dredge were a part of the vessel, and it was held that they were. Two facts appeared in this case—that the attachment was permanent and that the machinery in question was essential to the successful operation of the dredge.

It would seem that within the ordinary understanding of the term "vessel" both of these elements are essential before an article or machine in use on a ship can be regarded as part of the vessel. The office of this trawl net is to catch fish. It has to be frequently renewed and is not in any ordinary sense permanently attached to the vessel. It is easily detached and stored on board the vessel. It is no more essential to the use of the vessel in its ordinary employment than are chain cables or boats or signal lights and similar articles. We are of opinion, therefore, that these trawl nets are to be deemed a part of the equipment of the vessel and not a part of the vessel itself.

It follows that the decision of the Board of General Appraisers should be *affirmed.*