UNITED STATES *v.* ADMIRAL ORIENTAL LINE ET AL. (NO. 3298) [1]

United States Court of Customs and Patent Appeals, November 3, 1930

*Charles D. Lawrence,* Assistant Attorney General. (*Reuben Wilson* and *Ralph Folks,* special attorneys, of counsel), for the United States.
*John Ambler* (*Ira L. Ewers* of counsel) for appellees.

[Oral argument October 15, 1930, by Mr. Folks and Mr. Ewers]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Appellee, the Admiral Oriental Line, also styled the American Mail Line, of Seattle, Wash., owns the steamship *President Grant* and acts as operating agent for the Dollar Steamship Lines (Inc.) (Ltd.) which owns the steamship *President Jefferson* and the steamship *President McKinley,* which vessels are three of nine sister ships operated under American registry in trans-Pacific trade between United States Pacific coast ports and between the United States and certain ports in the Orient. The vessels were laid down in war time for troop-transport purposes and after the war were converted into first-class passenger ships. A large portion of the route traveled by said vessels is through tropical waters. When the vessels were built they contained no swimming tanks. Later steel swimming tanks were installed at

---

[1] T. D. 44359.

Shanghai, China, on the occasion of the vessels' regular calls at that port.

The swimming tanks, installed on the afterdeck of each of the vessels, are 17 feet long, 11 feet wide, and 8 feet deep. Steps lead from the deck to the top of the tank, which is surrounded by a 2-foot platform, which in turn has a railing around it about 30 inches high. The tank is constructed of five-sixteenths of an inch steel plates, and weighs approximately 2 tons. The installation of the tank necessitated the cutting of a crossbeam between No. 6 Sampson posts, and the cut part of the cross member was removed and the tank installed in its place and permanently secured to the remainder of the cross member, the cross member being a beam 12 by 12 inches square and about 20 feet long. The tanks were installed by the use of blue prints and are permanently attached to the hull of the vessel. The installation was made by working continuously 48 hours.

Captain Froberg, superintendent of the American Mail Line, charged with the operation of the vessels, including alterations and repairs, testified that the tanks were installed in Shanghai because it was cheaper there than in Seattle; that such installation was not necessitated by casualty or stress of weather during the voyage of the vessels; that the installation was made necessary in part by the change of the routes of the ships through southern waters.

The question presented by the protest of appellees is whether or not the cost of such installation of the swimming tanks was dutiable under section 466 of the Tariff Act of 1922, which reads as follows:

SEC. 466. That sections 3114 and 3115 of the Revised Statutes are amended to read as follows:

SEC. 3114. *The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel* documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; and if the owner or master of such vessel shall willfully and knowingly neglect or fail to report, make entry, and pay duties as herein required, such vessel, with her tackle, apparel and furniture, shall be seized and forfeited.

SEC. 3115. If the owner or master of such vessel, however, furnishes good and sufficient evidence that such vessel, while in the regular course of her voyage, was compelled, by stress of weather or other casualty, to put into such foreign port and purchase such equipments, or make such repairs, to secure the safety of the vessel to enable her to reach her port of destination, then the Secretary of the Treasury is authorized to remit or refund such duties, and such vessel shall not be liable to forfeiture, and no license or enrollment and license, or renewal of either, shall hereafter be issued to any such vessel until the collector to whom application is made for the same shall be satisfied, from the oath of the owner or master, that all such equipments and repairs made within the year immediately preceding such application have been duly accounted for under the provisions of this and the preceding sections, and the duties accruing thereon duly paid; and if such owner or master shall refuse to take such oath, or take it falsely, the vessel shall be seized and forfeited. [Italics not quoted.]

The vessels were also painted in the foreign port. The collector levied 50 per centum ad valorem duty on the cost of installing the tanks and upon the cost of painting. Appellees' protest covered both the items of painting and the installation of the tanks. The United States Customs Court, under the authority of *E. E. Kelly & Co.* v. *United States,* 17 C. C. P. A. (Customs) 30, T. D. 43322, overruled the protest as to the painting and sustained the same as to the cost of the installation of the swimming tanks. The Government's appeal here, therefore, involves the sole issue as to whether or not the cost of installation of the swimming tanks falls within the provision of said section 466, as follows: "The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel, etc." If the installation may be regarded as equipment or repairs, the assessment of the collector was correct. If not, the judgment of the court below must be affirmed.

In this court, while the Government contends that the installation might be either equipment or repairs, its chief contention is that it is repairs.

We do not think it can be equipment under the decisions of this and other courts, since the definitions of equipment laid down by the courts and promulgated by the Board of Naval Construction, by regulations of the Treasury Department, and in the Opinions of the Attorney General would seem to limit equipment for a vessel to those things that may be distinguished from the hull and fittings, equipment ordinarily being portable things and the hull and fittings being constituted of those things of a permanent character attached to the hull, which would remain on board if the vessel were to be laid up for a long period.

In *Otte* v. *United States,* 7 Ct. Cust. Appls. 166, T. D. 36489, certain trawl nets were imported for use on trawlers. The importer claimed the trawl nets to be entitled to free entry as a portion of the vessel as distinguished from equipment. The Treasury Department ruled that they were equipment. This court held them to be equipment and said:

That the Congress intended to distinguish between equipment and the vessel itself is apparent from a reading of the two subsections above quoted. The line of distinction between equipment and the vessel is somewhat difficult to mark.

This question was considered by the Board of Naval Construction, and their report in part reads as follows:

Equipment, used in a general sense, may be defined as any portable thing that is used for, or provided in, preparing a vessel whose hull is already finished for service. It is the furniture of whatsoever nature which is put into a finished ship in equipping her. The Queen's Regulations and Admiralty Instructions give the following definition: "Equipment, in relation to a ship, includes the furnishing a ship with any tackle, apparel, furniture, provisions, arms, munitions, or stores, or any other thing that is used in or about a ship for the purpose of fitting or adapting her for the sea or for naval service."

In estimating the displacement of a ship naval constructors use the term "hull and fittings" in contradistinction to "equipment," the fittings of the hull being understood to be any permanent thing attached to the hull which would remain on board were the vessel to be laid up for a long period.

Adopting these definitions, the board is of the opinion that the term "equipment" would not include donkey engines, pumps, windlasses, steam steerers, and other machinery, but that it would include anchors, chain cables, boats, life-saving apparatus, nautical instruments, signal lights, and similar articles.

To the same effect is *United States* v. *Richard & Co.*, 8 Ct. Cust. Appls. 231, T. D. 37496, wherein certain repair parts for Diesel engines were under construction. The court there, as in *Otte* v. *United States, supra,* quoted with approval the definition of equipment cited in the opinion of the naval board referred to in the *Otte* case. In the *Richard & Co.* case, Diesel engines were held to be part of the hull as distinguished from equipment. The spare repair parts carried in the vessel for use when necessity required were held to fall within the provision of "outfit and equipment."

In the *Otte* case this court called attention to certain definitions of equipment given by Attorney General Wickersham in 27 Op. Atty. Gen. 228, which follows:

It appears, therefore, that those appliances which are permanently attached to the vessel, and which would remain on board were the vessel to be laid up for a long period, are parts of the vessel itself. And, inasmuch as the pump and evaporator in question are so attached to this vessel and are essential and permanent parts of it, they are not a part of the equipment, but are material used in the construction of the vessel within the meaning of the statute.

The fact that they do not aid in keeping the vessel afloat or propelling it does not have a material bearing upon this question. * * * The vessel must be taken as a whole, with all the permanent attachments necessary or useful to accomplish the object for which it is designed.

The distinction between equipment and hull and fittings, as expressed in the opinion of the Attorney General, has also found expression in various regulations of the Treasury Department, promulgated for the administration of the tariff acts. In T. D. 34150 "outfit and equipment" are defined as follows:

* * * portable articles necessary or appropriate for the navigation, operation, or maintenance of a vessel, but not permanently incorporated in or permanently attached to its hull or propelling machinery, and not constituting consumable supplies. * * *

This regulation was made to apply to the Tariff Act of 1913. It will be seen, therefore, that in the year 1922, when the present act was passed, the legislature is presumed to have taken cognizance of the definitions of the term as laid down by the Treasury Department, by the Attorney General, and by this court.

In *Thorn* v. *Browne*, 257 Fed. 519, 523 (*certiorari* denied, 250 U. S. 645), the court said:

When a legislative body selects and uses in a statute words or clauses which before the enactment of the law had acquired by judicial interpretation or common consent and use a well-understood meaning and legal effect, the legal presumption is that it intended that they should have that meaning and effect in the statute it enacts.

The court below gave little consideration to the question whether or not the installation in issue constituted repairs, and the importer insists here that the Government for the first time in its brief before us strongly urges that the installation of the swimming tank falls within the category of repairs.

*Donnell* v. *The Starlight*, 103 Mass. 227, and *Homer* v. *The Lady of the Ocean*, 70 Me. 350, cited by the Government, are not in point. They refer to statutes of entirely different character from the one at bar and involve the meaning of the words "construction and repairs." The other citations of the Government are either not in point or are not controlling.

This court in *E. E. Kelly & Co.* v. *United States, supra*, in passing upon the dutiability of maintenance painting and in construing the identical statute at bar set out a number of definitions of the word "repair." They are as follows:

The word "repair" is defined by Funk & Wagnalls New Standard Dictionary as follows:

Repair, n. 1. The process of repairing; restoration after decay, waste, injury, or partial destruction; supply of loss; reparation; as, the *repair* of a building; often in the plural; as, to make *repairs* on a roof. 2. Condition after use; especially, good condition; condition after repairing; as, in what *repair* is the house?

The verbs "repair" and "maintain" are defined by the same authority as follows:

Repair, vt. 1. To mend, add to or make over; as, to *repair* a building. 2. To restore to a sound or good state; as, to *repair* health.

Maintain, v. 1. To hold or preserve in any particular state or condition; keep effective and from falling, declining, or ceasing; * * *. 2. To supply with means of support; provide for; sustain; keep up; * * *.

The word "maintenance" is defined as follows:

. Maintenance, n. 1. The act of maintaining, in any sense; * * * maintenance of way (*railroad*), the keeping in repair of tracks, roadbeds, bridges, etc.

The court held that painting which was not shown to be maintenance painting fell under the term "expenses of repair."

We think under these definitions the installation of the swimming tanks can not be regarded as repairs.

In *Gagon* v. *United States*, 193 U. S. 451, 457, the Supreme Court of the United States defined the word "repair":

The word "repair," as the word "amend," contemplates an existing structure which has become imperfect by reason of the action of the elements, or otherwise.

See also *Minneapolis Plumbing Co.* v. *Arcade Inv. Co.*, 145 N. W. 37, 124 Minn. 317; *Garland* v. *Samson*, 237 Fed. 31, and *Fuche* v.

*City of Cedar Rapids*, 139 N. W. 903, 158 Iowa 392, 44 L. R. A. (N. S.) 590.

The judgment of the United States Customs Court is, in all respects, *affirmed.*