(C. D. 1037)

R. P. Child (Pacific-Atlantic Steamship Co.) v. United States

United States Customs Court, Third Division

(Decided January 9, 1947)

*Lawrence & Tuttle (George R. Tuttle* and *Frank L. Lawrence* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General *(Joseph B. Brady* and *Harold L. Grossman,* special attorneys), for the defendant.

Before Cline, Keefe, and Ekwall, Judges

Keefe, Judge: The question at issue in this case arises by reason of the assessments of duty and internal revenue tax by the collector of customs at the port of Philadelphia upon certain lumber covered by two entries which was discharged at that port from the steamer *Jefferson Myers,* an American vessel operating under a permanent register.

Appraisement entry 116 relates to 50,000 board feet of Douglas fir lumber used to erect shifting boards and feeder boxes on the *Jefferson Myers* before she sailed to Russia with a cargo of grain from the United States. Upon 33,333 feet, board measure, the collector assessed duty at 50 cents per thousand feet, board measure, under paragraph 401, Tariff Act of 1930, as amended by the Canadian Trade Agreement, T. D. 49752, and an additional tax of $1.50 per thousand feet, board measure, under section 3424 of the Internal Revenue Code. The remaining 16,667 board feet were admitted free of duty under paragraph 1803 as firewood.

Ships' repair entry V-15 covers 15,041 board feet of Douglas fir lumber purchased in Sydney, Australia, and the costs of installing upon said vessel certain shifting boards and feeder boxes. The lumber cost £320 11s., and the cost of installation was £750, in all totaling £1070 11s., equal to $3,456 at the prevailing rate of exchange. Duty was assessed upon the basis of the total cost at 50 per centum ad valorem in accordance with the provisions of section 466, Tariff Act of 1930.

The plaintiff contends in the protest that dunnage is improperly the subject of duty; that it is not equipment or repairs within the meaning of section 466; that it is free of duty under paragraph 1615, as amended, as American goods returned, or under paragraph 1803 (2) as firewood. The protest was duly amended setting the claims out in more detail as follows:

Duty was improperly assessed at the rate of 50 percent under section 466, Tariff Act of 1930, upon the cost of dunnage and its installation.

Dunnage is not equipment or repairs within the meaning of said section, nor is the installation of dunnage a repair.

The dunnage was not "imported," and hence no duty should have imposed.

Alternatively it is claimed that the dunnage is free of duty under paragraph 1615, as American goods returned or under paragraph 1803 (1) as lumber or paragraph 1803 (2) as firewood.

If duty should be exacted the lumber is dutiable at 50 cents per thousand feet, board measure, under paragraph 401 as amended by the Canadian Trade Agreement, T. D. 49752, plus $1.50 per thousand feet board measure under section 3424, I. R. C.

It is alternatively claimed that the cost of this dunnage is exempt from duty under the provisions of section 3115 (2) Revised Statutes as amended by section 466, Tariff Act of 1930, it being produced in the United States.

In addition it is claimed that no duty should have been assessed under section 466 as the vessel referred to in this protest is not documented under the laws of the United States to engage in the foreign or coasting trade.

At the trial the plaintiff introduced the testimony of six witnesses. The deputy collector at the port of Portland, Oreg., testified that Portland is the home port of the American steamer *Jefferson Myers*, and that a permanent register was issued to that vessel. The operating manager of the Pacific Atlantic Steamship Co. testified that it is his duty to arrange for the loading of vessels at various points, to prepare the same for transporting particular cargoes, and to supervise the methods of loading. He testified that he made arrangements for the *Jefferson Myers'* itinerary and supervised her preparation to transport a cargo of bulk wheat from Vancouver, located on the Columbia River in the State of Washington, to Vladivostok, Russia; that before the vessel was loaded, installation was made of certain shifting boards and feeder boxes required by the Board of Underwriters before a permit is issued to transport bulk grain. He testified that a shifting board is a center-lined bulkhead, constructed through the center of the hold, running fore and aft, and braced by 6″ x 6″ shorings

extending·from the sides of the vessel to this center-lined bulkhead; that this bulkhead divides the hold equally into two parts and prevents the grain from shifting from side to side in heavy seas, and consequently, the vessel from capsizing; that a feeder box is a compartment covering·part of the grain in the lower hold, the purpose of which is to allow the grain contained therein to flow gradually into the lower hold as the grain therein settles; that the feeder boxes and shifting boards installed upon the *Jefferson Myers* were built from 50,000 feet of rough planks and timbers of American lumber purchased in Vancouver, Wash.; and that the lumber was Douglas fir purchased from the Eastern & Western Lumber Co., which has its own lumber operators in Oregon. The witness further testified that after the *Jefferson Myers* discharged its cargo of grain at Vladivostok, it proceeded in ballast to Sydney, Australia, stopping at Balik Papan for fuel. At Sydney, grain was loaded on the vessel for transportation to the port of Philadelphia; that at Sydney, additional lumber of American origin was purchased for installation of shifting boards and feeder boxes, presumably to replace such as were broken upon discharge of the grain at Vladivostok, or to conform with the requirements of the Board of Underwriters operating in Australia. According to the records of witness, 15,041 feet, board measure, were purchased for that purpose.

The deputy collector at the port of Philadelphia testified that a master of a vessel is required to report upon his arrival at an American port all of his expenses for equipment purchased or repairs made in a foreign port before he is allowed to receive his clearance papers; and even though the instant lumber was· of American origin, entry would be required under the provisions of section 466, inasmuch as it was reported as an expense to the vessel and entry under the provisions of paragraph 1615 as American goods returned would not be allowed. The inspector of customs at the port of Philadelphia testified that the lumber was scattered all over the pier and he measured it as much as possible; that the lumber was not new; that it had nails in it and some pieces were split and broken; and that he estimated the total amount of wood was approximately 50,000 board feet. The examiner of merchandise at the port of Philadelphia testified that he found the lumber was in piles from one end of the pier to the other; that the majority of it could be used again, estimating that one-third was suitable for firewood only and two-thirds suitable for resale and reuse.

The superintendent of George J. Haenn, Inc., engaged in erecting shifting boards and grain feeders in vessels carrying grain, testified that when a ship comes in for discharge at Philadelphia, the grain is removed into an elevator by means of an endless leg with a sucker; that after a certain amount is removed, the feeder boxes are pulled out by steam power with a line and boom; that in almost every in-

stance of removal, the shorings are broken and the boards come tumbling out; that it is necessary to remove these shorings so that the sucker can contact the wheat; that usually no attention is paid to the preservation of the lumber; that he saw the *Jefferson Myers* the second day after she had been discharging in the year 1940 and saw the lumber after it had been removed from the vessel, and also the shifting boards and feeder boxes being pulled out; that the lumber was thrown haphazardly in sections or piles on the dock; that the lumber was all irregular, split, and, of course, cut into short lengths in constructing the feeders; that he estimated 40 or 50 per centum was suitable for nothing more than firewood and another 25 per centum was unsuitable for use as grain feeders because it was cut out of size, split, and the heat of the grain on the long voyage would take the strength out of the lumber, putting it in a condition similar to kiln-dried lumber; and that the steamship company offered the lumber to him but he did not accept the offer because, in his opinion, it was not worth more than $75. The witness further testified that when the grain is removed from a ship nearly all of the boards fall down unless the ship is so constructed with stanchions that they are held up; and that usually in a ship like the *Jefferson Myers*, only about 25 per centum of the shifting boards are left standing.

The plaintiff contends as to entry V–15, that the 15,041 board feet of lumber made into shifting boards and feeder boxes were built into the hull of the vessel as a permanent installation, as that term may be understood, and that the term "equipment" is erroneously applied to the same, as well as to the costs of installation. In respect to entry 116, which covers 50,000 board feet of lumber, it is contended that that quantity was automatically discharged with the grain and was of no commercial value after landing; that as only 50,000 board feet of lumber were landed, only 70 per centum pertained to the original quantity and 30 per centum to the quantity taken aboard at Sydney, so that if a 50-per centum duty pertained to the 30-per centum portion, that portion would not also be dutiable at the 50-cent rate; that inasmuch as the 33,333 feet cannot be considered equipment, that quantity is not assessable with duty, as section 446 applies only to such as is equipment; and that the 50,000 board feet of lumber installed for the voyage to Vladivostok, not having been exported within the rule of the decisions governing exportation, may not be regarded as having been imported.

The Government contends that the *Jefferson Myers* is such a vessel as was contemplated by the provisions of section 466 and the shifting boards and feeder boxes are either equipment or repairs within the meaning of said section; that the record fails to establish that the goods are American goods returned, or that the entry requirements under that section have been met; and that upon discharge from the

vessel, the lumber becomes regularly dutiable by virtue of the provisions of section 446.

The provisions of the Tariff Act of 1930 in question read as follows:

SEC. 466. EQUIPMENT AND REPAIRS OF VESSELS.

Sections 3114 and 3115 of the Revised Statutes, as amended by the Tariff Act of 1922, are amended to read as follows:

"SEC. 3114. The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; * * *.

Paragraph 401 [as amended by the trade agreement with Canada, T. D. 49752]— 401 Timber hewn, sided, or squared, otherwise than by sawing, and round timber used for spars or in building wharves; sawed lumber and timber not specially provided for; all the foregoing, if of fir. spruce, pine, hemlock, or larch— 50¢ per thousand feet, board measure

PAR. 1803. [Free list] Wood:

(1) Timber hewn, sided, or squared, otherwise than by sawing, and round timber used for spars or in building wharves; sawed lumber and timber, not further manufactured than planed, and tongued and grooved; all the foregoing not specially provided for: * * *

(2) Logs; timber, round, unmanufactured; pulp woods; firewood, handle bolts, shingle bolts; gun blocks for gunstocks, rough hewn or sawed or planed on one side; and laths; all the foregoing not specially provided for.

PAR. 1615 [as amended by T. D. 49646]. [Free list]

(a) Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means.

|        *        |        *        |        *        |        *        |        *        |        *        |        *        |

(h) The allowance of total or partial exemption from duty under any provision of this paragraph shall be subject to such regulations as to proof of identity and compliance with the conditions of this paragraph as the Secretary of the Treasury may prescribe.

SEC. 446. SUPPLIES AND STORES RETAINED ON BOARD.

Vessels arriving in the United States from foreign ports may retain on board, without the payment of duty, all coal and other fuel supplies, ships' stores, sea stores, and the legitimate equipment of such vessels. Any such supplies, ships' stores, sea stores, or equipment landed and delivered from such vessel shall be considered and treated as imported merchandise.

From the foregoing evidence, it is clear that 50,000 board feet of Douglas fir lumber, the product of the State of Oregon, were used upon the steamer *Jefferson Myers* for the erection of shifting boards and feeder boxes in order that the vessel conform to the requirements of the underwriters in the transportation of bulk grain. It is also established by the evidence that 15,041 feet of Douglas fir were used upon said ship for the same purpose at the port of Sydney, Australia, for transportation of bulk grain to the United States. Although it is contended by the plaintiff that the lumber used in Australia was

American lumber and was free of duty as American goods returned, the evidence is insufficient to bring it within the exemption from duty granted in the case of American goods returned,' and the mandatory regulations attending free entry under paragraph 1615, *supra*, were not complied with.

The contention of plaintiff that the lumber established to be the product of Oregon and installed in the State of Washington was never exported would seem to be well-taken. However, as to the contention that it was not subject to duty for that reason, this does not follow in the situation here presented. Section 446, *supra*, while permitting vessels arriving in the United States from foreign ports to retain on board without payment of duty ships' stores, sea stores, and the legitimate equipment of such vessels,. specially provides that *all ships' stores, sea stores, or equipment landed and delivered from such vessel* shall be considered and treated as imported merchandise. In making such provision, Congress failed to distinguish between vessels of the United States and foreign vessels, or between such stores or equipment of American origin placed on board American vessels in American ports, and foreign articles taken on board in foreign ports. Consequently, this court is constrained to hold that the 50,000 board feet of lumber delivered from the *Jefferson Myers* was properly assessed as regularly imported merchandise by virtue of the provisions of said section.

Section 466, *supra*, was clearly intended by Congress to be treated entirely separate and apart from section 446, *supra*. Section 466 provides not only that an ad valorem duty shall be placed upon equipment or repair parts or materials to be used on board American vessels in a foreign port, but also that such duty shall be levied and paid upon the expenses of such repairs. The cost of the materials and labor necessary for the erection of the shifting boards and feeder boxes while the *Jefferson Myers* was in the port of Sydney, Australia, is clearly a dutiable item under the law. When the material used in the construction was landed and delivered from the vessel at the port of Philadelphia, such act of delivery brought into operation the provisions of section 446 and thus caused the levy upon the lumber from Australia of additional assessments of duty and tax as would apply to regularly imported merchandise. The . tariff act is not designed to levy duty only upon merchandise the product of foreign countries, but provides, title I, section 1, that duty "shall be levied, collected, and paid upon all articles when imported from any foreign country into the United States * * *." Congress, in section 446, brings all articles of equipments discharged from vessels within' the foregoing provisions, even though such articles are the product of the United States and never technically exported therefrom.

Plaintiff's contention in the protest that the *Jefferson Myers* was not documented under the laws of the United States to engage in the foreign or coasting trade within the meaning of section 466, and

therefore not subject to the assessment of 50 per centum ad valorem duty, was thoroughly discussed and decided adversely to such contention by this court in the case of *American Mail Line, Ltd., et al.* v. *United States*, 13 Cust. Ct. 149, C. D. 885, wherein this court held without merit the plaintiffs' contentions that the vessels to which section 466 refers consist exclusively of such as are documented to engage in either the foreign or the coasting trade on the northern, northeastern, and northwestern frontiers of the United States, otherwise than by sea, as provided for in Title 46, United States Code, section 258. On appeal to the Court of Customs and Patent Appeals, however, the protests were held insufficient to raise the question presented, and it was not passed upon. See *American Mail Line, Ltd.* v. *United States*, 34 C. C. P. A. 1, C. A. D. 335.

As to plaintiff's contention that the shifting boards and feeder boxes are excluded from the definition of repairs or equipment, counsel for the Government has admirably pointed out in his brief that the decisions of the courts have held adversely to such contention, citing *Pacific & Atlantic Steamship Co.* v. *United States*, Abstract 41649; *United States* v. *Richard & Co.*, 8 Ct. Cust. Appls, 231, T. D. 37496; *Admiral Oriental Line* v. *United States*, 56 Treas. Dec. 234, T. D. 43585; *Folger* v. *United States*, 2 Treas. Dec. 537, T. D. 21670 (G. A. 4575); *Kelly* v. *United States*, 17 C. C. P. A. (Customs) 30, T. D. 43322; *American Mail Line, Ltd.* v. *United States*, 24 C. C. P. A. 70, T. D. 48377; and *Warner, Trustee* v. *United States*, 28 C. C. P. A. 143, C. A. D. 136; and distinguishing *United States* v. *Admiral Oriental Line et al.*, 18 C. C. P. A. (Customs) 137, T. D. 44359; *Admiral Oriental Line* v. *United States*, 59 Treas. Dec. 1150, T. D. 44886; and *Admiral Oriental Line* v. *United States*, 61 Treas. Dec. 285, T. D. 45453, cited by the plaintiff.

For the reasons stated, judgment will be entered in favor of the Government overruling the protest.