(C. D. 1430)

H. C. GIBBS *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 11, 1952)

*Graham & Morse (Lawrence, Tuttle & Harper* (by *George R. Tuttle*) and *Henry R. Rolph* of counsel) for the plaintiff.

*Charles J. Wagner,* Acting Assistant Attorney General (*Dorothy C. Bennett,* special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

JOHNSON, Judge: This action involves the cost of materials, labor, and other expenses incident to installing on board the steamship *Gretna Victory* certain shifting boards and feeder boxes, which were necessary for the transportation of grain, and also the costs incident to the painting and lettering of parts of the ship's hull while the ship was in Canada immediately prior to her arrival at the port of Seattle on January 29, 1948.

The *Gretna Victory* is documented under the laws of the United States to engage in foreign or coasting trade and is owned by the United States Maritime Commission. During the period here involved, it was operated by the States Marine Corporation of Delaware.

At the trial counsel for the Government moved to dismiss the protest upon the ground that *prima facie* it appeared to be a suit by the United States against the United States. However, the plaintiff produced the bareboat charter agreement, admitted in evidence as collective exhibit 1, under which the ship was operating in January 1948. This evidence was supplemented by the testimony of a well-qualified maritime lawyer that under a charter of such character, the operator is placed in the position of the owner of the vessel as to liability for "all the operating costs of the vessel * * * and all operating expenses." Ruling upon the motion was reserved by the court. In brief of Government counsel, the motion to dismiss was abandoned.

One of plaintiff's contentions is, however, that no duty should have been assessed for the reason that the vessel was owned by the United States, and many cases arising under the maritime laws are cited to support such contention. It must be borne in mind, however, that this proceeding does not arise under the admiralty laws and it is not an action *in rem*, but, on the other hand, is an action brought by H. C. Gibbs, acting for the States Marine Corporation of Delaware, for the return of money paid which is claimed to have been wrongfully demanded by the collector of customs of such plaintiff. The payment in question was not demanded and paid as a penalty. It was paid in accordance with the provisions of the Tariff Act of 1930, where, under section 466, an ad valorem duty of 50 per centum is levied upon the cost of certain foreign equipment and repairs to vessels of the type here involved, and it is provided that such duty shall be assessed on the first arrival thereafter in any port of the United States. The record establishes that the master of the *Gretna Victory* filed the necessary entry for the disputed items and that the liquidated duties were duly paid. Consequently, no penalties accrued and the provisions for the seizure and forfeiture of the vessel were not invoked. An action by the Government in the seizure of a vessel under the admiralty laws is entirely different and apart from an action arising

under section 466 of the Tariff Act of 1930. As a matter of fact, both actions may be separately maintained. In *Western Operating Corp.* v. *United States*, 18 Cust. Ct. 1, C. D. 1036, affirmed in *United States* v. *Western Operating Corp.*, 35 C. C. P. A. 71, C. A. D. 373, a motion by plaintiff to introduce in evidence the record in *United States, Libellant* v. *12,536 Gross Tons of Whale Oil ex The "Charles Racine,"* Respondent, in Admiralty No. 6332, was denied upon the ground that the issues were not similarly involved. The court, therefore, finds no merit in plaintiff's contention that duty was not assessable because of the fact that the vessel was owned by the United States.

Upon the merits of the case, the record shows that duty at 50 per centum ad valorem was assessed under the provisions of section 466 of the Tariff Act of 1930 upon $9,090, the expenses incurred in Vancouver, B. C., for work performed upon the *Gretna Victory* as follows:

| | |
|---|---:|
| Erecting shifting boards fore and aft in lower holds to pass Port Wardens Inspection for the carriage of bulk grain 4563 net reg tons at 75¢ per ton | $3, 422. 25 |
| Building 9 feeders in main hatchways at 6½¢ per feeder per net reg tons 4563 net reg tons by 9 by 6½¢ | 2, 669. 36 |
| | 6, 091. 61 |
| Plus 7% | 426. 41 |
| | 6, 518. 02 |
| Plus overtime | 1, 388. 00 |
| Plus 10% work. compens. | 138. 80 |
| Plus 10% supervision | 138. 80 |
| Total of this bill | 8, 183. 62 |
| Painting in lettering "CHRISTMAS SHIP PACIFIC NORTHWEST U. S. A." on Port and Starboard sides of hull in 4 foot white letters, half way between deck and load line. Erecting staging for access to ship's sides and removing on completion of painting | 425. 00 |
| [Changed by collector from $450 to $425] | |
| Painting vessel's topsides black as directed. Painting in vessel's name on bow and stern | 423. 00 |
| Transportation, cartage, etc., incurred while vessel at LaPointe Pier January 24th to 26th, and United Grain Growers January 27, 1948 | 58. 07 |
| Total | $9, 089. 69 |

[Expense of $97, of which $38.93 was free and $58.07 dutiable]

Henry C. Gibbs, captain of the *Gretna Victory*, testified on behalf of the plaintiff substantially as follows: While the vessel was at Vancouver, British Columbia, the vessel was put in readiness to load a cargo of grain. To insure the safety of the vessel, it was necessary to erect shifting boards and feeder boxes in the cargo holds. Before a

permit is issued by the Canadian Board of Underwriters to transport bulk grain, grain linings are required. These shifting boards were made of lumber about 3 inches thick, 10 inches wide, and of various lengths. They form a wall extending fore and aft so as to divide each hold into two parts. Upright timbers are used as well as the timbers extending lengthwise. Feeder boxes also are built of lumber and act as a funnel in the top of the hatch so that the grain can run down into the hold. In loading, the feeder boxes are left full of grain as the grain settles during the course of the voyage. If these grain linings were not used, the ship might list to such an extent that she might become disabled. At Vancouver, grain was loaded in numbers 1, 3, 4, and 5 holds and was discharged at Antwerp, Belgium. Grain was loaded in number 2 hold at the port of Seattle, Wash. This particular grain was discharged at Bremen, Germany. After leaving Vancouver, the vessel proceeded to Seattle, Tacoma, Portland, San Francisco, Long Beach, and then to Panama. The bulk grain was unloaded by means of a pipe put into the top of the feeder box through which the grain is sucked out. After the discharge of the grain at Antwerp, the shifting boards and the feeder boxes were dismantled by the crew and stored "in between decks of the ship's hold." Finally, the lumber was disposed of in Genoa, Italy.

Relative to the painting performed upon the vessel, the witness testified that the words "Christmas Ship Pacific Northwest U. S. A." were not necessary at the time for the preservation of the metal portion of the hull and that the hull was painted black from the main deck to the water deck, not for the purposes of preservation, but to give the ship a smarter appearance because the cargo was being donated to the European countries, and in Seattle, Tacoma, and Portland, there was wide publicity given the vessel upon her appearance in port. Respecting the condition of the ship before painting and the reason therefor, the witness testified:

Q. What was the condition of that part of the ship's hull when you arrived in Vancouver so far as concerns paint?—A. The ship needed a coat of paint, black, because rust was coming through and she looked mighty bad.

Q. And when you say the ship needed a coat of paint, the black, are you including in that answer the portion of the port and starboard where you put "Christmas Ship Pacific Northwest"?—A. That is right.

\* \* \* \* \* \* \*

Q. Did the "Gretna Victory," the hull of the "Gretna Victory" require its usual or annual or semi-annual painting at the time you were in Vancouver?

\* \* \* \* \* \* \*

A. No, no.

Q. What did you mean then a few moments ago, Captain, when you said rust was showing through in some spots, or words to that effect?—A. It is all right, but we wouldn't have had time to paint it just with the ship's crew, and we don't generally have this work done in the shipyards.

Q. No, but whether you would have had time or not, I an trying to find out from you, Captain, whether the paint which was applied in painting these words "Christmas Ship Pacific Northwest" was necessary at that time for the preservation of the metal portion of the hull.—A. No, sir, it was not.

Q. Now, did you do any other painting there, that is, other than putting the words on?—A. We gave the ship a coat of black paint, the hull, we put the names on them.

Q. And when you say the hull, how much of the hull?—A. Just the black.

Q. Well, I don't know where the black stops, Captain.—A. Well, that is from the top or the main deck down to the water deck.

\*      \*      \*      \*      \*      \*      \*

Q. Captain Gibbs, why did you give the hull this coat of black paint in Vancouver?—A. We give the ships this coat of paint.

Q. Maybe it wasn't black.—A. Just to make the ship have a cleaner appearance when we got in Seattle.

Commander Douglas S. Egan, United States Naval Reserve, testified for the Government that he had considerable experience in using feeder boxes and shifting boards for carrying bulk grain cargos. He testified that the shifting boards are installed to confine the grain to a small area in order to prevent its rapid shifting when the vessel gets into a sea wave, and that the feeder box is a bin which acts as a funnel. He testified that after a cargo of grain is discharged, the shifting boards and feeder boxes are removed from the vessel in order that the general cargo may be handled. In his experience, shifting boards and feeder boxes are not usually installed as a permanent part of the vessel, although a ship in the grain trade might reuse the same boards. In his experience, shifting boards and feeder boxes are not included in the blueprints of the vessel. The witness described the removal of the shifting boards during the unloading process as follows:

Well, you see, as the grain cargo is taken out of the vessel they usually take down the shifting boards—they come down, like taking coal out of a bin, so to speak; if the coal gets lower you take down the front of the bin.

In the opinion of the witness, the term "dunnage" refers to lumber, matting, or other materials, usually lumber, laid in the bottom of a vessel to keep certain types of cargo clean and dry, and to some extent to prevent shifting; that shifting boards are not usually of the same dimensions as dunnage, although having the common purpose of being employed in the stowage of cargo and making a vessel seaworthy. Dunnage mats were described by the witness as not being permanently attached to the vessel and are generally used in connection with a bag cargo to separate the lots and keep the cargo clean and dry.

The plaintiff contends that the grain linings are neither within the meaning of the term "equipment" nor "repairs" in section 466 of the Tariff Act of 1930, and are, in fact, consumable supplies and outside the scope of said section.

Plaintiff further contends that the painting is not subject to duty under said section of the law because it was strictly ornamental in character, and did not constitute a repair, not being within the term "maintenance painting."

It is further contended that the expenses of transportation and cartage of materials and labor are not dutiable costs under said section.

Counsel for the Government contends that the shifting boards, feeder boxes, and part of the lettering involved herein consisted of temporary equipment to be used in connection with the particular cargo, and, as such, are dutiable as ships' equipment under the provisions of section 466; that the costs of painting the ship's hull and repainting her name are dutiable as ships' repairs under the same paragraph; and that the expenses incurred for transporting labor and materials used in connection with the aforesaid equipment and repairs are dutiable under section 466 as an element of the "cost" thereof.

Section 466 of the Tariff Act of 1930 provides as follows:

SEC. 466. EQUIPMENT AND REPAIRS OF VESSELS.

Sections 3114 and 3115 of the Revised Statutes, as amended by the Tariff Act of 1922, are amended to read as follows:

"Sec. 3114. The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; and if the owner or master of such vessel shall willfully and knowingly neglect or fail to report, make entry, and pay duties as herein required, such vessel, with her tackle, apparel, and furniture, shall be seized and forfeited. For the purposes of this section, compensation paid to members of the regular crew of such vessel in connection with the installation of any such equipments or any part thereof, or the making of repairs, in a foreign country, shall not be included in the cost of such equipment or part thereof, or of such repairs.

"Sec. 3115. If the owner or master of such vessel furnishes good and sufficient evidence—

"(1) That such vessel, while in the regular course of her voyage, was compelled, by stress of weather or other casualty, to put into such foreign port and purchase such equipments, or make such repairs, to secure the safety and seaworthiness of the vessel to enable her to reach her port of destination; or

"(2) That such equipments or parts thereof or repair parts or materials, were manufactured or produced in the United States, and the labor necessary to install such equipments or to make such repairs was performed by residents of the United States, or by members of the regular crew of such vessel,

then the Secretary of the Treasury is authorized to remit or refund such duties, and such vessel shall not be liable to forfeiture, and no license or enrollment and license, or renewal of either, shall hereafter be issued to any such vessel until the

collector to whom application is made for the same shall be satisfied, from the oath of the owner or master, that all such equipments and repairs made within the year immediately preceding such application have been duly accounted for under the provisions of this and the preceding sections, and the duties accruing thereon duly paid; and if such owner or master shall refuse to take such oath, or take it falsely, the vessel shall be seized and forfeited."

In the case of *Todd Shipyards Corp.* v. *United States*, 7 Cust. Ct. 135, C. D. 554, this court pointed out that every commodity having a value which is brought within the limits of the United States constitutes imported merchandise within the meaning of the customs laws and is subject to the assessment of duty, unless specifically exempted therefrom. In section 466, *supra*, the Congress included within the meaning of the term "imported merchandise" not only the equipment and parts of vessels but the repair parts or materials used, or the expenses of repairs made while in a foreign port to a vessel documented under the laws of the United States to engage in the foreign or coasting trade, and provided that a duty of 50 per centum should be levied thereon.

In controversies heretofore arising relative to the meanings of the terms used in section 466, *supra*, this and our appellate court have amply defined what the term "equipments" comprehended, and distinguished it from the hull and fittings of vessels, and also what would constitute repairs of vessels.

In the case of *United States* v. *Richard & Co.*, 8 Ct. Cust. Appls. 231, T. D. 37496, the appellate court stated:

It is unnecessary to enter upon an extended review of all the authorities cited by either party. As was pointed out in the case of Otte *v.* United States, supra [7 Ct. Cust. Appls. 166, T. D. 36489], the Board of Naval Construction was at one time asked to define the word "equipment," and complying with the request it said in substance that equipment in a general sense might be defined as any portable thing that is used for or provided in preparing a vessel whose hull was already finished, for service; that the term "hull and fittings" was commonly used in contradistinction to "equipment"; that the "fittings of the hull" were understood to be any permanent thing attached to the hull which would remain on board were the vessel to be laid up for a long period; and that "equipment" in relation to a ship includes furnishing the ship with tackle, apparel, and other things used in or about a ship for the purpose of fitting or adapting her for the sea or for naval service.

In *United States* v. *Admiral Oriental Line et al.*, 18 C. C. P. A. (Customs) 137, T. D. 44359, the appellate court applied the rule that "equipment" for a vessel is ordinarily limited to portable things as distinguished from the hull and fittings which are things so attached as to be permanent installations, and it held that the painting of the vessel there involved was dutiable under section 466 of the Tariff Act of 1922, whereas permanently installed swimming tanks were not.

In the case of *Pacific & Atlantic Steamship Co.* v. *United States*, 2 Cust. Ct. 761, Abstract 41649, certain dunnage mats were assessed for duty as ships' equipment under section 466, *supra*. In holding

the mats to be properly dutiable as equipment under said section, the court stated:

Equipment of vessels is limited to portable things such as furnishings of a ship with any tackle, apparel, furniture, provisions, arms, munitions, or stores, or any other thing that is used in or about a ship for the purpose of fitting or adapting her for the sea, and also to articles to be used in renewal or replacement of articles of original outfit and equipment. Equipment has been held to include portable articles and things necessary or appropriate for the protection or befitting comfort of those on board, considering the service in which the vessel is engaged. See *United States* v. *Admiral Oriental Line*, 18 C. C. P. A. 137, T. D. 44359, and authorities therein cited, and also *Otte* v. *United States*, 7 Ct. Cust. Appls. 166, T. D. 36489, and *Southwestern Shipbuilding Co.* v. *United States*, 13 Ct. Cust. Appls. 74, T. D. 40934. In the latter case the court stated:

As ordinarily understood, the term "outfit and equipment," considered together, includes everything requisite to properly perform a service or to properly accomplish some definite object or purpose.

The vessel here in question was in the sugar trade and the evidence clearly shows that dunnage mats are always used in connection with shipments of sugar. These mats are properly used in the performance of the service of transporting sugar, and, in our opinion, they are of such a nature that their use on board vessels properly accomplishes some definite purpose and therefore come directly within the definition of equipments of vessels.

In the case of *R. P. Child* v. *United States*, 18 Cust. Ct. 11, C. D. 1037, certain lumber was discharged at the port of Philadelphia from the American steamship *Jefferson Myers*. It appeared that 50,000 board feet of Douglas fir lumber were used to erect shifting boards and feeder boxes upon the vessel before she sailed to Russia with a cargo of grain from the United States. It appears from the court's decision in that case that after the vessel discharged its cargo of grain at Vladivostok, Russia, it proceeded in ballast to Sydney, Australia, where it was again laden with grain for transportation to the port of Philadelphia. However, before lading the grain at Sydney, additional lumber of American origin was purchased for installation of shifting boards and feeder boxes, presumably to replace such as were broken upon discharge of the grain at Vladivostok, or to conform with the requirements of the Board of Underwriters operating in Australia. According to the evidence produced, 15,041 feet, board measure, were purchased for that purpose.

Upon 33,333 feet, board measure, the collector assessed duty at 50 cents per thousand feet, board measure, under the provisions of paragraph 401, Tariff Act of 1930, as amended by the Canadian Trade Agreement, T. D. 49752, and also an additional tax of $1.50 per thousand feet, board measure,. under section 3424 of the Internal Revenue Code. The remaining 16,667 board feet were admitted free of duty under paragraph 1803 as firewood. In addition to the foregoing levies, a duty of 50 per centum ad valorem under section 466, *supra*, was assessed upon the cost of installation in Sydney, Australia,

of the 15,041 feet, board measure, as additions to the shifting boards and feeder boxes.

The plaintiff there contended, as appears in the court's decision, as follows:

The plaintiff contends as to entry V–15, that the 15,041 board feet of lumber made into shifting boards and feeder boxes were built into the hull of the vessel as a permanent installation, as that term may be understood, and that the term "equipment" is erroneously applied to the same, as well as to the costs of installation. In respect to entry 116, which covers 50,000 board feet of lumber, it is contended that that quantity was automatically discharged with the grain and was of no commercial value after landing; that as only 50,000 board feet of lumber were landed, only 70 per centum pertained to the original quantity and 30 per centum to the quantity taken aboard at Sydney, so that if a 50-per centum duty pertained to the 30-per centum portion, that portion would not also be dutiable at the 50-cent rate; that inasmuch as the 33,333 feet cannot be considered equipment, that quantity is not assessable with duty, as section 446 applies only to such as is equipment; and that the 50,000 board feet, of lumber installed for the voyage to Vladivostok, not having been exported within the rule of the decisions governing exportation, may not be regarded as having been imported.

The court held that the 33,333 board feet of lumber were properly dutiable and taxable as assessed by the collector for reasons not here pertinent. The court also held that the lumber used in the construction of the shifting boards and feeder boxes, as required by the Board of Underwriters to be installed upon vessels when transporting grain, was properly assessed for duty as ships' equipment under section 466, *supra*.

From the evidence before the court, it is clear that the *Gretna Victory* was equipped with wooden shifting boards and feeder boxes, necessary to prepare the vessel for the service of carrying grain on a particular voyage; that the installations so required were not attached to the hull but were wedged in place and were taken down immediately after discharge of the grain cargo, having remained on board in connection with the transportation of the grain about 1 month, after which such installations became loose lumber stored in the ship's hold until disposed of in Italy. Substantially the same situation prevailed in the *Child* case, *supra*, as to the lumber taken on at Sydney, Australia, and made into feeder boxes and shifting boards, where such costs were held to be properly assessed under section 466, *supra*, as equipment, etc., even though the lumber removed was in part only suitable for firewood. We adhere to that view in the case before us here.

Relative to painting the hull of the vessel black between the decks and repainting the ship's name thereon, as well as the expenses of cartage of materials and labor, this court is of the opinion that the cost thereof is properly dutiable under the provisions of section 466 as "repairs." Although it is contended that the painting in question was strictly ornamental and in no sense performed for the

preservation of the vessel and, therefore, cannot be considered "maintenance painting," it remains a fact that, irrespective of the intention behind the act, the painting of the ship black in order to present a better appearance to the public had the effect of restoring the old and rusted surfaces, and since the repainting of the hull covered the ship's name, it became necessary thereafter to paint the name *Gretna Victory* over the new black paint.

The painting of the words "Christmas Ship Pacific Northwest U. S. A." does not appear to be in the nature of a restoration of the vessel or a necessary act after the performance of painting, such as the repainting of the name of the ship. The words were painted upon the sides of the ship purely for advertisement purposes to show the nature of the voyage. The words were neither applied to the sides of the vessel as an ornamentation, as a preservation of the vessel, nor as a restoration. Although it is the opinion of the court that the sums expended in painting the vessel's topsides black and the painting or repainting of the vessel's name on the bow and stern were properly included in the dutiable costs as repairs, following the ruling of our appellate court in the case of *E. E. Kelly & Co.* v. *United States*, 17 C. C. P. A. (Customs) 30, T. D. 43322, we do not believe that the cost of lettering the words "Christmas Ship Pacific Northwest U. S. A." on the port and starboard sides of the hull in 4-foot white letters, is a dutiable item under the ruling in that case, or is included within the provisions of section 466, *supra*, as the expenses of repairs made in a foreign country.

Judgment will therefore be entered in favor of the plaintiff insofar as it is claimed that no duty should have been assessed upon the expenses incurred in painting the words. "Christmas Ship Pacific Northwest U. S. A." upon the sides of the *Gretna Victory*. In all other respects the protest is overruled.