H. C. GIBBS *v.* UNITED STATES (No. 4750)[1]

[1] C. A. D. 529.

58

United States Court of Customs and Patent Appeals, June 3, 1953

*Graham & Morse, Lawrence, Tuttle & Harper* (*Henry R. Rolph* and *George R. Tuttle* of counsel) for appellant.

*Charles J. Wagner*, Acting Assistant Attorney General (*Richard F. Weeks*, special attorney, of counsel), for the United States.

[Oral argument April 14, 1953, by Mr. Rolph and Mr. Weeks]

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Associate Judges

COLE, Judge, delivered the opinion of the court:

The SS *Gretna Victory*, a vessel owned by the United States Government, and documented to engage in foreign or coasting trade, by charter agreement, was being operated by the States Marine Corporation in January of 1948. At that time, the vessel was in the port of Vancouver, British Columbia, being placed in readiness to receive a cargo of grain for delivery to certain ports in Belgium and Germany.

The cargo to be placed aboard in Vancouver had been donated by various charitable organizations and individuals for the relief of the people of Europe, and the ensuing voyage of the *Gretna Victory* was considered in the nature of a mercy or goodwill or Christmas enterprise. In this respect, the journey was to be favorably publicized and it was thought that the vessel would draw considerable attention upon her appearance in certain ports wherein she would stop in the course of the trip.

That the safety of the vessel might be assured, and in compliance with Canadian law relative to a vessel carrying a cargo of bulk grain, it was necessary that certain grain linings be installed in and about the ship's holds. This work was done in Vancouver, as well as painting the ship's hull from main deck to water deck, repainting the vessel's name thereon, and painting also, on the hull, "Christmas Ship Pacific Northwest U. S. A."

Upon arrival of the vessel in the port of Seattle to load the remainder of the cargo preparatory to the overseas voyage, the collector, under section 466 of the Tariff Act of 1930 (19 U. S. C. sections 257, 258),

assessed duty at 50 per centum of the cost of materials, labor, and other expenses incident to the work completed in Vancouver. Protest was seasonably filed by H. C. Gibbs, Master of the *Gretna Victory*, on behalf of the States Marine Corporation. The United States Customs Court, Third Division, in ruling on the protest, held that the costs incurred in painting the words "Christmas Ship Pacific Northwest U. S. A." on the hull of the ship were not subject to duty, but that assessment on the remainder of the work aforementioned was properly levied. *H. C. Gibbs* v. *United States*, 28 Cust. Ct. 318, C. D. 1430.

This appeal thus presents for our consideration the applicability of the dutiable provision for ship's equipment and repairs which, insofar as pertinent, reads as follows:

SEC. 466. EQUIPMENT AND REPAIRS OF VESSELS

Section 3114. The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; * * *

The grain linings aforementioned consisted of shifting boards and feeder boxes. Shifting boards are pieces of lumber of varying lengths which are installed in the ship's holds, extending lengthwise as well as upright, said boards acting to divide each hold into two parts. As previously noted, such boards are indispensable to the proper operation of a vessel engaged in carrying a bulk grain cargo as they function to confine the grain to relatively small areas, thereby preventing the grain from shifting (and causing the ship to list) in heavy seas. The feeder boxes are built over the hold at the top of the hatches (again of lumber, varying in size) and function in a funnel-like capacity, whereby the grain runs down into the hold and settles therein, enough grain, however, remaining in the feeder boxes to take care of the slack in the hold. At the time of unloading the cargo of grain at its destination, the feeder boxes are utilized somewhat in reverse, i. e., by pipe arrangement placed in the feeder boxes, the grain is "sucked out" of the hold to an outside depository.

The court below found from the evidence in the case that the grain linings in question were not attached to the ship's hull, but instead were wedged in place in the hold, and that immediately upon discharging the grain cargo, (one month after departure from Vancouver) the shifting boards and feeder boxes were dismantled and stored until subsequent disposal of the lumber thereof in Genoa, Italy.

With respect to the painting of the vessel, Captain Gibbs testified that a coat of black paint was applied from main deck to water deck on the hull, and as the ship's name had been partially obliterated by reason thereof, the name, *Gretna Victory*, was repainted on the ship's

bow and stern. The witness testified that rust was showing through on the hull in spots, and "she looked mighty bad," and that although the ship did not require its annual or semi-annual coating of paint, such was done to make the ship look "half decent" because of the nature of the voyage, and "we knew we would have lots of people down to visit us." The witness further testified to the effect that the paint was not necessary to preserve the hull and that the ship could have operated for considerable time without the necessity of being repainted.

The court below was of the opinion that the cost of the paint work was a repair within the meaning of section 466, *supra*, notwithstanding the testimony of Captain Gibbs. The court said:

* * * Although it is contended that the painting in question was strictly ornamental and in no sense performed for the preservation of the vessel and, therefore, cannot be considered "maintenance painting," it remains a fact that, irrespective of the intention behind the act, the painting of the ship black in order to present a better appearance to the public had the effect of restoring the old and rusted surfaces, and since the repainting of the hull covered the ship's name, it became necessary thereafter to paint the name *Gretna Victory* over the new black paint.

Considering the mission of the voyage in question, all of which appears to have been quite meritorious, it is easy for us to appreciate a desire of those responsible for the undertaking to have the appearance of the ship, meaning principally her outside condition, as presentable and attractive as possible in keeping with the laudable purposes of the shipment. The testimony is sufficiently strong to support a finding that the rust to which we have referred, to some extent at least, justified and made necessary a new paint job, and such testimony, as we view it, outweighs the other reasons assigned for such painting. In other words, we feel that the weight of the testimony is strongly in support of a finding to the effect that the painting of the ship's hull was done primarily because of the rusted condition, and therefore should be designated as a repair within the meaning of section 466, *supra*, as found by the trial court.

The principal contention of the plaintiff herein is that the grain linings in question cannot properly be considered as ship's equipment.

As stated in the case of *United States* v. *Richard & Co.*, 8 Ct. Cust. Appls. 231, the problem of what constitutes equipment is a question which "must always be determined in view of the function of the vessel itself and the part which such articles play in enabling it to perform such function." It is entirely clear to us that while the *Gretna Victory* was not particularly designed in the first instance to carry grain in bulk, she was adapted to such purpose by the installation of grain linings which, as previously indicated, were of absolute necessity to the safety and proper operation of the vessel, and further, as counsel for appellant stated during oral argument, necessary to make the undertaking financially sound.

The United States Customs Court considered the case of *R. P. Child* (*Pacific-Atlantic Steamship Co.*) v. *United States*, 18 Cust. Ct. 11, C. D. 1037, to be controlling and decisive of the issue herein. The facts in that case are slightly different from those of the instant case in that we are here dealing with duties imposed upon initial installations claimed by the Government to be equipment. In the cited case, the court was dealing with *repairs* to similar construction, i. e., upon grain linings installed in a way completely comparable to that described herein, said linings being used to accommodate a return cargo of grain. Whereas in the *Child* case, the feeder boxes and shifting boards had never been removed from position on the vessel during the particular voyage, the grain linings on the *Gretna Victory* were taken down following discharge of the grain in Europe. The court determined in the *Child* case that "the cost of the materials and labor necessary for the erection of the shifting boards and feeder boxes while the *Jefferson Myers* was in the port of Sydney, Australia, is clearly a dutiable item under the law."

The record before us clearly establishes that, as a general practice, grain linings are dismantled after the bulk grain is discharged from the vessel, unless the cargo on the return trip is to be grain also. The necessity of removing the linings in the instant case, as pointed out, was to allow general cargo to be handled.

We agree with the Government that the grain linings in question are temporary equipment used in connection with the particular voyage under consideration. The law fully supports that view.

In *Southwestern Shipbuilding Co.* v. *United States*, 13 Ct. Cust. Appls. 74, the court said:

As ordinarily understood, the term "outfit and equipment" considered together, includes everything requisite to properly perform a service or to properly accomplish some definite object or purpose. * * * we are satisfied that portable articles and things necessary or appropriate for the protection or befitting comfort of those on board, or for the proper navigation or safety of a vessel, and not sea stores or a part of the hull or propelling machinery, come within the designation "outfit and equipment." * * *

The foregoing seems tantamount to holding that the words "outfit" and "equipment" are, in the sense used, practically synonymous. See also *United States* v. *Richard Co., supra.*

In the case of *H. E. Warner, Trustee, American Mail Line, Ltd.* v. *United States*, 28 C. C. P. A. (Customs) 143, we said:

Generally the "term 'equipment' includes the necessary adjuncts of a service and imports the outfit needed or required to accomplish a special object or purpose." (citing *Cruger's* (*Inc.*) v. *United States*, 12 Ct. Cust. Appls. 516)

In holding that crockery was equipment within the meaning of section 466 of the Tariff Act of 1930, the court, in the *Warner* case,

cited with approval the decision in the *Southwestern* case, and quoted from a report of the Naval Board of Construction, as follows:

The term "outfit and equipment" is defined as including portable articles necessary or appropriate for the navigation, operation, or maintenance of a vessel, but not permanently incorporated in or permanently attached to its hull or propelling machinery, and not constituting consumable supplies * * *

The appellant argues that the grain linings in question are not equipment within the meaning of section 466, *supra*, but are consumable supplies, and appellant cites several state court decisions in support of this contention. It is further argued by the appellant that in the event that the grain linings are determined by this court to be part of the ship's equipment, that then the provisions of section 446 of the Tariff Act of 1930 (19 U. S. C. section 1446) are applicable, and the equipment, never having been landed in the United States, is not subject to duty. We are not persuaded by either of these contentions.

As to what constitutes consumable supplies, we stated in the *Warner* case, *supra* (page 150), (reaffirming the settled doctrine of this court) that " 'sea stores,' as distinguished from 'ship's stores' or 'ship's equipment,' are 'consumable supplies.' However, * * * 'consumable supplies' or 'sea stores' are 'supplies for the consumption, sustenance, and medical needs of the crew and passengers during the voyage' ". That the grain linings in question are not consumable supplies is thus amply demonstrated and readily apparent by a proper application of the foregoing ruling.

Having determined that the shifting boards and feeder boxes here in issue are part of the ship's equipment, it is necessary to consider the applicability of section 446 which, insofar as pertinent, reads as follows:

SEC. 446. SUPPLIES AND STORES RETAINED ON BOARD

Vessels arriving in the United States from foreign ports may retain on board, without the payment of duty, all coal and other fuel supplies, ships' stores, sea stores, and the legitimate equipment of such vessels. Any such supplies, ships' stores, sea stores, or equipment landed and delivered from such vessel shall be considered and treated as imported merchandise. * * *

While the Customs Court did not discuss section 446 as such, it is obvious that the two sections, i. e., 446 and 466, are somewhat contradictory, but a clear analysis thereof gives each its own sphere of activity and application. In the *Warner* case, *supra*, while section 446, claimed by counsel for appellant therein to be pertinent to the issues in the case, was set forth in full in the opinion of the court (although a proof-reader's error is apparent), no reference whatsoever was made to its provisions, the case being decided entirely because of the assumed applicability of section 466. We conclude, therefore, that having determined, as we did in the *Warner* case,

that the items involved were properly part of the ship's equipment, and therefore clearly within the provisions of section 466, *supra,* there was no necessity to anticipate a factual situation not actually existing therein to which section 446, *supra,* might have applied.

In the *Child* case, *supra,* the Customs Court stated that section 466 was "clearly intended by Congress to be treated entirely separate and apart from section 446," and in accordance with such expression, the court therein overruled importer's protest against assessment of duty on the grain linings installed in a foreign port, under section 466, and also upheld the additional assessment of duty levied on the material used in the construction of said linings when such material was landed in the port of Philadelphia, under the provisions of section 446.

In the instant case, the fact that the grain linings installed in Vancouver were never landed in the United States does not nullify or render inoperative the applicability of section 466.

For the reasons hereinbefore stated, the judgment of the United States Customs Court is *affirmed.*